IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| MICHAEL G. MULHERN )<br>   1340 SE 7th Street )<br>   Stuart, Florida 34996, )<br>          Plaintiff )<br> )<br> )<br>        V. ) | Case No. _____ |
|  )<br>DONALD RUMSFELD )<br>   Secretary, )<br>   United States Department of Defense )<br>   1000 Defense Pentagon )<br>   Washington, D.C. 20301, )<br>          Defendant ) |  |

**COMPLAINT**

Plaintiff, Michael G. Mulhern, by and through his undersigned counsel, respectfully submits this complaint against Defendant Donald Rumsfeld, in his capacity as Secretary of the United States Department of Defense, for violations of The Privacy Act of 1974, 5 U.S.C. 552a, including but not limited to the "No Disclosure Without Consent" Rule, 5 U.S.C. 552a(b), and the "Access to Records" provisions at 5 U.S.C. 552a(d).

This Complaint brings a claim of disclosure without consent of a misconduct investigation of Mr. Mulhern by officials of the National Reconnaissance Office (NRO), an agency within the Department of Defense,. As a result of these disclosures, Mr. Mulhern has suffered, and continues to suffer, <u>inter alia,</u> loss of the benefits of employment, pecuniary loss,

and extreme emotional pain and suffering.

In support of his complaint, Mr. Mulhern alleges and states as follows:

### JURISDICTION AND VENUE

1. Plaintiff's claim arises under 5 U.S.C. 552a, commonly known as "The Privacy Act." This Court has subject matter jurisdiction over this claim, and venue is proper within the District of Columbia pursuant to 5 U.S.C. 552a(g)(5). The Privacy Act of 1974 became effective September 27, 1975. It protects federal employees such as the Plaintiff, and was in force during Plaintiff's tenure as a federal employee.

### PARTIES

2. Plaintiff is Michael G. Mulhern. He is currently a resident of Stuart, Florida. From January, 2001 to December 3, 2004, Mr. Mulhern was a civilian Security Specialist, assigned to the National Reconnaissance Office (NRO) in the United States Air Force.

3. Defendant Donald Rumsfeld is the Secretary of Defense and therefore the chief executive officer of the Department of Defense. His address is 1000 Defense Pentagon, Washington, D.C. 20301. He is sued in his official capacity.

### FACTS GIVING RISE TO THIS COMPLAINT

4. Michael Mulhern has had an exemplary career as a federal employee for over 14 years. Originally hired in 1990 as a GS-6, he consistently won the approval of his supervisors and received progressive promotions and increased responsibility throughout his tenure. He was a

sworn federal law enforcement officer from 1990 to 1994 and a Certified Federal Polygraph Examiner from 1994 through 2001. During that time he received outstanding performance appraisals every year and three Exceptional Service Awards. By the time he resigned in 2004, he had achieved a GS-13 ranking in his position as a Civilian Security Specialist at the U.S. Air Force, assigned to the National Reconnaissance Office (NRO).

5. Mr. Mulhern's supervisor at NRO for the period relevant to this complaint was Robert Shaheen (now retired). Mr. Shaheen was responsible for managing the west coast NRO polygraph office where Mr. Mulhern worked. Mr. Shaheen also gave Mr. Mulhern outstanding performance reviews including a mid-year performance review of "excellent" in January, 2004.

6. However, in late January 2004, Mr. Shaheen telephoned Mr. Mulhern to tell him that one of his polygraph sessions had been reviewed by Quality Assurance staff at NRO Headquarters in Chantilly, Virginia. They reported that Mr. Mulhern made "critical errors," during the examination. Mr. Shaheen warned Mr. Mulhern that the review would most likely lead to some disciplinary action against him.

7. On February 18th, 2004, Mr. Shaheen notified Mr. Mulhern that Mr. Lance Riedman, Director of the NRO Polygraph Branch had instructed Mr. Shaheen to have Mr. Mulhern immediately stop running polygraph exams until an investigation into the matter was completed.

8. Mr. Robert Burns, Chief of Quality Assurance Branch, called Mr. Mulhern and asked

him to fly to NRO Headquarters in Washington, DC to discuss the matter at a meeting on March 1, 2004. Mr. Mulhern did so.

9. The March 1, 2004, meeting was attended by Mr. Riedman, Mr. Burns and Mr. Otto Jackson, the Deputy Director of the NRO Polygraph program. During the course of the meeting, the three senior officials exhaustively questioned Mr. Mulhern and attempted to convince him to admit improper conduct. Mr. Mulhern refused to do so. At the end of the meeting Mr. Riedman expressed his disappointment that Mr. Mulhern had not admitted wrong doing.

10. Mr. Mulhern never heard from any of the three senior polygraph managers again until the day he resigned in December, 2004. On that day he received a phone call from Mr. Otto Jackson. No report of any investigation or other resolution of the allegations against Mr. Mulhern was ever provided to him, despite numerous requests for the information he made to Mr. Shaheen between April 2004 and December 2004.

11. By mid-April, 2004, Mr. Mulhern was reporting to work but still was given no duties. He asked Mr. Shaheen about the investigation and when he could return to his previous duties on a weekly basis, but received no updates on the status of the investigation, nor any proposed disciplinary action.

12. Mr. Mulhern, feeling his federal career was in jeopardy, began exploring other job opportunities. He had previously worked for Mr. Steve Olson at the Central Intelligence Agency (CIA). Mr. Olson had left federal service and began working as a senior security manager at

Lockheed Martin in California in 2001. Between 2001 and 2004, Mr. Olson had often encouraged Mulhern to leave the government and come to Lockheed Martin.

13.     In April, 2004, during a phone conversation, Mr. Mulhern told Mr. Shaheen he was thinking of calling his old supervisor, Steve Olson, for a job.

14.     Mr. Shaheen responded that he had recently spoken to Mr. Olson. Mr. Shaheen told Mr. Mulhern that he (Shaheen) had told Mr. Olson that Mr. Mulhern was suspended from his duties, and was under investigation for alleged misconduct in the performance of polygraph exams. Mr. Shaheen's exact words were, "I told Olson everything."

15.     The Privacy Act applies to federal employees, which Mr. Mulhern was at the time of the above-mentioned conversation. The statute includes a "No Disclosure Without Consent Rule" which states: "No agency shall disclose any record which is contained in a system of records by any means of communication to any person, or to another agency, except pursuant to a written request by, or with the prior written consent of the individual to whom the record pertains." 5 USC 552a(b).

16.     Mr. Mulhern did not give Mr. Shaheen consent to reveal this information to Mr. Olson. Mr. Shaheen violated Mr. Mulhern's rights under the Privacy Act, when he disclosed the allegations and investigation of Mr. Mulhern to Steve Olson.

17.     In June, 2004, the investigation into how Mr. Mulhern conducted his polygraphs was four months old.  Mr. Mulhern had not heard from any responsible federal officials regarding the status of the allegations or the investigation that was supposedly ongoing.  He was assigned to sit in his office and do nothing.  He hired a lawyer, Michelle Perry with the firm of Kalijarvi, Chui and Newman in Washington, DC.  Ms. Perry contacted the NRO's Office of General Counsel but never heard back from them.

18.     After hearing that Mr. Shaheen had told Mr. Olson "everything" about his investigation, Mr. Mulhern knew he could not call Mr. Olson to take him up on his long-standing offer to come and work for him at Lockheed Martin.  The deliberate leak of confidential personnel information had destroyed Mr. Mulhern's best job prospect, and poisoned his best employment reference at the largest defense contractor in the world.

19.     Mr. Mulhern also believes Mr. Olson may have passed this information from Mr. Shaheen to mutual colleagues of theirs from their employment at the CIA.  This tarnished his reputation, and caused severe, permanent damage to his career.  As a polygraph examiner, his most valuable professional asset is his reputation.

20.     In February, 2004, Mr. Mulhern had contacted Mr. Daniel Engle, the Director of Security at Lockheed Martin in Arizona, about possible employment there.  In October 2004, Mr. Engle contacted Mr. Mulhern to offer him a position with his security team.  In November, 2004, Mr. Engle notified the NRO of the employment offer to Mr. Mulhern and received permission to

transfer sponsorship of Mr. Mulhern's security clearance to Lockheed Martin. Mr. Mulhern was offered a start date in his new position at Lockheed Martin of December 6, 2004.

21.    Mr. Mulhern accepted the position and resigned from the NRO effective December 3rd, 2004. Up to and including that date, Mr. Mulhern had never heard a word from NRO management about the status of their investigation.

22.    However, when Mr. Mulhern reported to work at Lockheed Martin on December 6, 2004, Mr. Engle told him the NRO had temporarily held up the transfer of his clearance. The NRO stated that the reason for this was that his routine five year background investigation was out of scope. Mr. Engle told him that he was going to request that the background investigation be conducted immediately and that Lockheed Martin would wait for the matter to be resolved.

23.    The background investigation was conducted and appeared to be finished by the end of January 2005. However, NRO refused to allow the transfer of his clearance. There was no explanation from the agency or any indication that there was a problem with the security clearance.

24.    Mr. Mulhern knew from his experience as a Polygraph Examiner that Lockheed Martin would routinely wait anywhere from six to twelve months or more for security clearance issues to be resolved before rescinding an employment offer or terminating an employee. Usually, only in cases where the federal government actually denied a security clearance, would Lockheed Martin consider termination. Even in cases of clearance denial, Mr. Mulhern had seen Lockheed

Martin stand by an employee while he or she exercised their due process appeals to a negative security clearance decision.

25.    Therefore, Mr. Mulhern was shocked when, in March 2005, six weeks after his background investigation had been completed, Mr. Engle notified him that Lockheed Martin upper management had decided he would be immediately terminated.

26.    Mr. Mulhern alleges that the decision was made because Lockheed Martin senior management learned of the internal NRO investigation that had been conducted, without resolution, during 2004.  By Mr. Shaheen's own admission, one senior security manager at Lockheed Martin, namely Mr. Olson, was already improperly informed of the allegations.

27.    Mr. Mulhern further believes Mr. Shaheen disclosed information about him to other senior Lockheed Martin officials, including Ms. Veronica Romero.  Over the years Mr. Mulhern worked for NRO, Mr. Shaheen frequently shared personal information about Lockheed Martin employees that was gained in polygraph examinations conducted by the NRO.  Mr. Shaheen would openly comment on this practice, and on his close professional relationship with Ms. Romero.  Mr. Shaheen even justified sharing the polygraph information with her by claiming that Ms. Romero was a strong supporter of the NRO polygraph program and could be counted on to support it.  Many or all of the NRO polygraph program employees witnessed this behavior on the part of Mr. Shaheen.

28. Mr. Mulhern alleges that the reason his employment offer from Lockheed Martin was withdrawn was that several senior managers in the security division at Lockheed Martin had been improperly informed of the unsubstantiated misconduct allegations against him.

## DAMAGES

29. Incorporating the above paragraphs 1-28, Plaintiff hereby makes a claim for damages under 5 U.S.C. 552a(g), et seq., including but not limited to the following:

    1. Mr. Robert Shaheen, Mr. Mulhern's direct supervisor, did willfully and intentionally violate the Plaintiff's rights under 5 U.S.C. 552a(b)(5) when he informed Mr. Steve Olson, a private citizen with no official or unofficial reason for having the protected information, and without written consent from Plaintiff, of the allegations of misconduct and the investigation by the Agency into the charges against Plaintiff.

    2. Despite numerous requests by the Plaintiff, and for over 18 months, the Agency has refused to release the results of its supposed misconduct investigation, or resolve the allegations of misconduct against the Plaintiff.   This failure has prevented Mr. Mulhern from addressing the allegations and from clearing his name or correcting the record, and serves as a continuing impediment to finding gainful employment.

    3. The disclosure has caused damage to Mr. Mulhern's career which is both severe and permanent.  The damage to his reputation among his former co-workers at the CIA and his contacts in private industry were both embarrassing and humiliating.  It has resulted in at least one lost employment opportunity with Lockheed Martin.

    4. The violation of his privacy has proven very costly to Mr. Mulhern's future, and his

ability to provide for his family financially, by destroying his professional and personal reputation and standing in both the public and private sectors of the National Security community, thereby preventing him from finding gainful employment.

5. Mr. Mulhern has suffered extreme emotional pain and suffering resulting from the stress of being under perpetual investigation and from the financial damage to his wife and family.

## REQUEST FOR RELIEF

Plaintiff hereby requests the following relief:

1. Monetary damages in the amount of $1,000,000.00 for loss of income, damage to professional standing and reputation, and emotional and psychological pain and suffering;

2. Access to all records related to the investigation of the Plaintiff's alleged misconduct;

3. Access to the results of the periodic reinvestigation conducted for his security clearance in January 2005;

4. All attorney fees and costs associated with this action;

5. Any other relief the courts deems appropriate.

Respectfully submitted,

_____
F. Douglas Hartnett
DC Bar # 466851
Elitok and Hartnett at Law, LLC
2428 Wisconsin Ave., NW
Washington, DC 20007
202-965-0529